

SO ORDERED,

**Judge Katharine M. Samson**
**United States Bankruptcy Judge**
**Date Signed: January 18, 2023**

The Order of the Court is set forth below. The docket reflects the date entered.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| IN RE: AMY N. MURRAY | CASE NO. 20-01587-KMS |
| DEBTOR | CHAPTER 7 |
| | |
| DANA ROBERTSON | PLAINTIFF |
| V. | ADV. PROC. NO. 20-00032-KMS |
| AMY N. MURRAY | DEFENDANT |

## OPINION ON NONDISCHARGEABILITY

This matter came on for trial on Plaintiff Dana Robertson's adversary complaint against Debtor-Defendant Amy N. Murray, ECF No. 1, objecting to the dischargeability of a debt under 11 U.S.C. § 523(a)(6). This proceeding is core under 28 U.S.C. § 157(b)(2)(I).

Robertson alleges that Murray posted false and defamatory statements about her on the social media platform Twitter, that she is entitled to compensatory and punitive damages for the harm she suffered, and that the damages are nondischargeable because Murray willfully and maliciously inflicted the injury. Under the law as applied to the facts adduced at trial, Robertson is entitled to $75,000 in compensatory damages only, the debt for which is excepted from Murray's chapter 7 discharge.

## PROCEDURAL HISTORY

Eighteen months before Murray filed the underlying case, Robertson obtained a $500,000 default judgment against her in a state-court defamation action. *See* Order Granting Default J., ECF No. 1-1. Robertson's adversary complaint asserts that the debt is nondischargeable because Murray's conduct resulting in the entry of the judgment meets the "willful and malicious" standard under § 523(a)(6) so that issue preclusion applies. Compl., ECF No. 1 at 3.

This Court considered whether issue preclusion applies and concluded that it does not, because the specific issue litigated could not be identified from the record and because the related damages award was not enforceable under state law. *See Robertson v. Murray (In re Murray)*, Adv. No. 20-00032, 2022 WL 982736, at *7 (Bankr. S.D. Miss. Mar. 31, 2022). Hence, this trial.

## STIPULATIONS

"[F]actual stipulations are formal concessions that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 677-78 (2010) (cleaned up). Here, the parties stipulated to three relevant facts—two in the pretrial order and one orally in the courtroom before the trial:

(1) "Debtor authored the defamatory statements about Robertson." Pretrial Order, ECF No. 93 at 2.

(2) "Debtor referred to Robertson in the defamatory statements made." *Id.*

(3) Tom Hinton, a witness released on the parties' agreement, had no relevant information to which he could testify. Trial Tr., ECF No. 105 at 4; *see* ECF No. 100 (subpoena).

## BACKGROUND

Murray tweeted the statements at issue against the backdrop of a controversy about college football recruiting that centered on Robertson's husband, Steve Robertson, and the football coach

at the University of Mississippi ("Ole Miss"), Hugh Freeze. Steve Robertson published a book, *Flim Flam: The Truth Behind the Blind-Faith Culture that Led to the Explosive NCAA Investigation of Ole Miss Football*, in which he "details how he uncovered Hugh Freeze's phone call to an escort service, through public records, which ultimately led to Freeze's resignation." Antonio Morales, *Steve Robertson discusses his book Flim Flam, and what's next*, Clarion Ledger, (Sept. 27, 2017), https://www.clarionledger.com/story/sports/college/football/2017/09/27/steve-robertson-discusses-his-book-flim-flam-and-whats-next/709591001/.

That story is not part of the trial record. But it was extensively reported by national news outlets under such headlines as "The tattooed, dreadlocked recruiting analyst who toppled Hugh Freeze and Ole Miss," Will Hobson, Washington Post, (Nov. 21, 2017), https://www.washingtonpost.com/sports/the-tattooed-dreadlocked-recruiting-analyst-who-toppled-hugh-freeze-and-ole-miss/2017/11/21/3c93c9c6-ce4c-11e7-81bc-c55a220c8cbe_story.html?tid=ss_mail.

## FINDINGS OF FACT

Murray tweeted the following statements:

> With all these tell all books Rosebowl [Steve Robertson] keeps penning . . . maybe it's time I write my own about growing up in Natchez with his wife? I could title it "Wham Bam Thank You Mam".
>
> [I]f history repeats its course, she's probably tweeting 2-3 at one time. A tweet train.
>
> I didn't say she was a ho . . . but . . . [meme video with text graphic "HO!"]
>
> Besides . . . it's the honest to God Truth. I'm not bearing false witness. I witnessed her disappear too many times at parties out into the woods with guys. Sometimes more than 1 and sometimes more than 2. I remember being embarrassed for her.

Robertson Ex. 1, ECF No. 104 at 3, 4, 5, 7. The rest of the findings derive from the testimony of the three witnesses: Murray; her ex-husband, Jimmy Murray; and Robertson.

The tweets were false, and Robertson was embarrassed and humiliated by them—although Murray's primary target was not Dana Robertson, but her husband, Steve Robertson. ECF No. 105 at 27. Murray, an Ole Miss fan, had never met Steve Robertson. *Id.* at 12. But she wanted to "get him to shut up" about Hugh Freeze because Freeze had shown such concern for her ailing father. *Id.* at 27-28 ("I had just lost my daddy and Ole Miss was our thing. And I was extremely protective of Hugh Freeze because he was, you know, praying for my daddy, getting the football [team] to pray for my daddy."). Hurting Dana was how Murray would hurt Steve.

Murray testified that she "guess[ed]" her mental illness prevented her from understanding the difference between right and wrong. *Id.* at 34. But Murray did not establish that she was mentally ill to any relevant extent. She could not state a diagnosis. *Id.* at 33 ("I don't really know what the diagnosis was. I know I had major panic disorder and major—severe depression, chronic—I don't really know what I've been—I mean, I haven't seen the papers."). She testified that her mental illness is currently so severe that she is "penniless" and financially dependent on her family. *Id.* at 35-36. But she also admitted that she does not receive Social Security Disability Insurance payments and that she did not receive them four years ago, when she was tweeting about Robertson. *Id.* To her Twitter audience, she attributed the tweets to one-too-many margaritas. *See id.* at 24-25 (Q: Did you make a statement on Twitter that you snapped after your second margarita and made all these . . . posts about Dana Robertson? . . . . A: Yes, sir.").

## CONCLUSIONS OF LAW

A creditor seeking an exception to discharge must first establish the existence and amount of the debt under applicable nonbankruptcy law. *BancorpSouth Bank v. Avery (In re Avery)*, 594 B.R. 655, 661 (Bankr. S.D. Miss. 2018). Where, as here, no preexisting judgment establishes the debt, the bankruptcy court has the jurisdiction to both liquidate the debt and to enter a

nondischargeable judgment against the debtor. *Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 478-80 (5th Cir. 2009).

But before considering the questions of debt and dischargeability, the Court addresses—and overrules—an objection by Robertson's attorney to questions about Murray's mental state. *See* ECF No. 105 at 30-33.

### I. Murray's Mental Health Is Relevant Only on the Question of Punitive Damages.

Murray's attorney began the challenged line of questioning with "Are you stressed today? . . . Do you suffer from mental illness? . . . Are you being treated for your mental illness?" *Id.* at 30. Robertson's attorney objected on the ground of relevance. *Id.*

Counsel would be correct as to relevance if Robertson sought only compensatory damages. "It is the general rule in this and other states that, although a person may be suffering from a mental condition so as to be insane, nevertheless he is required to respond in compensatory damages for injuries resulting from his torts." *Banks v. Dawkins*, 339 So. 2d 566, 568 (Miss. 1976) (action to recover for personal injuries resulting when defendant shot plaintiff in the head and face with a shotgun after being ejected from plaintiff's "supper club"); *see also Sartain v. White*, 588 So. 2d 204, 212 (Miss. 1991) (citing *Banks*). Even if Murray had been so deranged that she "did not know or appreciate the nature or consequences" of her tweets and "did not know that it was wrong" to falsely defame Robertson, still she would be required to compensate Robertson for her injuries. *Banks*, 339 So. 2d at 568.

But Robertson also seeks punitive damages. *See* ECF 105 at 55. And it is equally well settled that "a lunatic is not liable at all" for punitive damages. *Paxton v. Paxton*, 222 So. 2d 834, 837 (Miss. 1969). Further, Murray may properly testify as a lay witness about her own mental state. *See United States v. Sanjar*, 876 F.3d 725, 738 (5th Cir. 2017) (holding that even if testimony

by mental illness patients implicated "specialized knowledge," it also "was informed by the patient's experience" and was admissible).

Consequently, the objection is overruled—although whatever mental illness, if any, that may have afflicted Murray the day she was tweeting was not serious enough to shield her from punitive damages if this Court were inclined to award them, *see infra* Section II-E. Murray simply used exceedingly poor judgment in thinking she could publish false and defamatory statements on the Internet and not be held accountable.

### II. Robertson Proved Defamation in the Form of Libel Under Mississippi Law.

"Defamation is that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." *Speed v. Scott*, 787 So. 2d 626, 631 (Miss. 2001) (quoting *Prosser & Keeton on the Law of Torts* § 111 (W. Page Keeton et al. eds., 5th ed. 1984)) (cleaned up). The general tort of defamation comprises the twin torts of slander for oral defamation and libel for defamation in "[a]ny written or printed language," *Blake v. Gannett Co.*, 529 So. 2d 595, 603 (Miss. 1988) (quoting *Chatham v. Gulf Publ'g Co.*, 502 So. 2d 647, 650 (Miss. 1987)). Tweets are written statements and therefore analyzed as libel.

[I]n determining whether a publication is libelous, it must be considered as a whole . . . ." *Whitten v. Com. Dispatch Publ'g Co.*, 487 So. 2d 843, 845 (Miss. 1986) (quoting *Manasco v. Walley*, 63 So. 2d 91, 95 (Miss. 1953)) (rejecting defendant's argument to consider headline and article separately because "no ordinary reader would logically separate the headline from the text"). As to whether the statement is merely opinion, which is not actionable, the relevant inquiry is "whether the statement could be reasonably understood as declaring or implying a provable assertion of fact." *Lewis v. Loftin*, No. 3:17-CV-00180, 2019 WL 1867937, at *8 (N.D. Miss. Apr.

25, 2019) (quoting *Roussel v. Robbins*, 688 So. 2d 714, 723 (Miss. 1996)); *see also Ferguson v. Watkins*, 448 So. 2d 271, 276 (Miss. 1984) ("Opinion statements are actionable only if they clearly and unmistakably imply the allegation of undisclosed false and defamatory facts as the basis for the opinion.").

Falsity is the threshold question in a defamation action. *Blake*, 529 So. 2d at 602. If the plaintiff cannot show that the statement is false, it is irrelevant whether it is defamatory. *Id.* at 603.

For either libel or slander, an "ordinary" plaintiff in Mississippi must prove the following elements:[1]

(1) a false and defamatory statement concerning the plaintiff;

(2) an unprivileged publication to a third party;

(3) fault amounting at least to negligence on the part of the publisher; and

(4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Simmons Law Grp., P.A. v. Corp. Mgmt., Inc.*, 42 So. 3d 511, 517 (Miss. 2010) (quoting *Moon v. Condere Corp.*, 690 So. 2d 1191, 1195-96 (Miss. 1997)).

**A. The Tweets Were False and Defamatory Statements About Robertson.**

1. The Tweets Were False.

Robertson credibly testified that the tweets were "[a]bsolutely not" true. ECF No. 105 at 45. Robertson "didn't go to parties in high school"; she "had a small group of friends that we were together every weekend." *Id.* Further, she did not even know Murray; she "never even laid eyes

---

[1] An "ordinary" plaintiff is an individual who is neither a public figure nor a private individual who has become a "limited purpose" or "vortex" public figure by "thrust[ing] himself or becom[ing] thrust into the vortex of a matter of legitimate public interest." *Simmons Law Grp., P.A. v. Corp. Mgmt., Inc.*, 42 So. 3d 511, 517-18 (Miss. 2010) (quoting *Moon v. Condere Corp.*, 690 So. 2d 1191, 1195-96 (Miss. 1997)). Here, there is no allegation and no evidence that Robertson is a public figure or a vortex public figure.

on Amy Murray until [the trial]." *Id.* They did not "run with the same crowds" in high school or even attend the same schools, *id.*, a fact Murray admitted, *id.* at 6.

As for the only two men Murray "knew" had had sexual intercourse with Robertson, *id.* at 19, one, Murray's ex-husband, flatly denied that he had, *id.* at 41. And the other was stipulated to have no relevant information. *Id.* at 4.

### 2. The Tweets Were Defamatory.

The parties stipulated that the tweets referred to Robertson. And they are not merely opinion. The tweet that begins "Besides . . . it's the honest to God Truth" asserts a provable fact, that Robertson had sexual relations at identifiable places and times with identifiable men. *See Lewis*, 2019 WL 1867937, at *8. The other tweets "unmistakably imply" that she often engaged and still does engage in such behavior. *See Ferguson*, 448 So. 2d at 276. Considered together, their "clear and unmistakable" meaning, *Blake*, 529 So. 2d at 603, is that Robertson was and is promiscuous, a label that when applied to a woman "tends to injure reputation," *Speed*, 787 So. 2d at 631.

### B. The Tweets Were Unprivileged Publications to Third Parties.

### 1. The Tweets Were Publications.

"Publication requires a communication of the statement to another person or persons [other than the plaintiff]." Mississippi Law of Torts § 11:5 (2d ed.), Westlaw (database updated December 2021). Here, Robertson credibly testified that her husband, their three older children, and the children's schoolmates read the tweets. ECF No. 105 at 44, 46, 47. And although she could not be certain how many others read them, Robertson accurately observed that "the sad thing about social media is who knows who all read it?" *Id.* at 46. That Robertson will never be sure who or

how many of her family, friends, co-workers, casual acquaintances, and others saw the tweets is discussed under Section II-D.

2. No Privilege Applies.

"[A] person who publishes words which would otherwise be defamatory may be excused from liability because of privilege." *J.C. Penney Co. v. Cox*, 148 So. 2d 679, 682 (Miss. 1963). The privilege may be absolute, for example, as to a witness's testimony at trial. *See Knight v. R.S.*, 315 So. 3d 549, 552 (Miss. Ct. App. 2021) (quoting *Gunter v. Reeves*, 21 So. 2d 468, 470 (Miss. 1945)). Or the privilege may be qualified, for example, as to an employer's statement against an employee when the statement affects the employment. *See Raiola v. Chevron U.S.A., Inc.*, 872 So. 2d 79, 85 (Miss. Ct. App. 2004) (citing *Young v. Jackson*, 572 So.2d 378, 383 (Miss. 1990)); *see also Hays v. LaForge*, 333 So. 3d 595, 602-03 (Miss. Ct. App. 2022) (describing qualified privilege generally as applying to communications made in good faith between persons with a common interest in or duty related to the subject matter).

Murray did not assert any privilege, and even if she had, no privilege would apply.

**C. Murray's Fault Exceeds the Required Standard.**

Defamation alleged by an ordinary plaintiff like Robertson requires proof of fault amounting to only negligence. *Simmons Law Grp.*, 42 So. 3d at 517. "It is difficult to transfer the negligence concept from the world of physical-harm torts to the world of words." Dan B. Dobbs et al., *The Law of Torts* § 565 (2d ed.), Westlaw (database updated July 2022). But generally, the standard for negligence is whether the defendant "acted as a reasonable and prudent person would have under the same or similar circumstances." *Pointer v. Rite Aid Headquarters Corp.*, 327 So. 3d 159, 172 (Miss. Ct. App. 2021) (quoting *Johnson v. Goodson*, 267 So. 3d 774, 778-79 (Miss.

2019)). Murray did not act as a reasonable and prudent person would have, as she implicitly admitted when she blamed her supposed mental illness.

But if Robertson's damages are to be held nondischargeable, Murray's fault must exceed negligence and even recklessness. *See Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998) ("[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)."). That Murray's conduct meets this more stringent standard is established under Part III.

### D. Robertson Need Not Prove Special Harm to Recover Damages.

Under Mississippi law, all libel is actionable per se, meaning the plaintiff need not prove special harm. *Brewer v. Memphis Publ'g Co.*, 626 F.2d 1238, 1245-46 (5th Cir. 1980); *see also Lewis*, 2019 WL 1867937, at *7 (citing *Brewer*); *see generally* Restatement (Second) of Torts § 569 cmt. b (Am. Law Inst. 1977) (stating that "'actionable per se' . . . denote[s] the fact that the publication is of such a character as to make the publisher liable for defamation although no special harm results from it"). "Special harm is the loss of something having economic or pecuniary value." *Speed*, 787 So. 2d at 632 (quoting Restatement (Second) of Torts § 575 cmt b). The rule that special harm is not required recognizes that "defamation is a 'dignitary' tort which does not lend itself easily to precise proof of damages," Mississippi Law of Torts § 11:17. "Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Brewer*, 626 F.2d at 1246 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)).

Robertson testified compellingly about the humiliation and embarrassment she felt both in her family and in her community.

As to her relationship with her husband:

> [H]e showed [the tweets] to me and asked me if it was true.
> . . . .
> My husband and I didn't meet until after—long after high school. So, he did not know me then. He had no way to know where [sic] these things [were] true. And having to explain to him that every bit of this was a lie was extremely degrading and embarrassing.
> . . . .
> Steve and I even went to a marriage boot camp to rekindle what we had had because this damaged us, you know. Because in the back of his mind I'm sure he asked himself many times is any of this true? And it was something that we really had to work through. And it was difficult . . . .

ECF No. 105 at 45-46, 48.

As to knowing that her children and their schoolmates saw the tweets:

> [T]hat hurt the most. I raised my children in a Christian home. They know the values that I've taught to them and for them to read these things and think these things about their mother was embarrassing. . . . And my oldest son . . . was so angry that he was on Twitter defending me, you know. And for him to have to do that is heartbreaking for a mother.

*Id.* at 46.

As to her anxiety at her workplace:

> I'm a registered nurse. . . . And almost daily I would have a patient ask me with a smile on their face are you Steve Robertson's wife? So they knew who I was. And when this happened every time I walked into a patient's room I had in the back of my mind are they thinking these things about me? Did they read those tweets? They probably did, you know. If they know who my husband is then they knew the drama that was happening. And that was extremely stressful and made me anxious and made it more difficult to do my job . . . .

*Id.* at 47.

Robertson said she was "sure" many of her friends saw the tweets, but she couldn't know which friends or how many:

> Because mature adults don't go up to other adults and say were you a ho? I mean, that's not a conversation that you have. So no one personally approached me although I knew that they had—I knew people had read them. . . . Thousands of people read those tweets I'm certain.

Page **11** of **16**

*Id.* at 46.

This actual harm inflicted by Murray's tweets entitles Robertson to $75,000 in damages. Recognizing the difficulty of putting a price on "personal humiliation, and mental anguish and suffering," *Brewer*, 626 F.2d at 1246, this Court takes as a floor the amount awarded in *Gamboa v. Grace Paint Co.*, No. 3:10-cv-416, 2012 WL 774995 (S.D. Miss. Mar. 7, 2012). There, the court found that the plaintiff's employer, in the presence of co-workers, called her a "nymphomaniac"; said she had flirted with him; and accused her of being promiscuous. *Id.* at *4. The court held that the words imputed to the plaintiff "a want of chastity" and were therefore slander per se.[2] *Id.* The court awarded her $20,000. *Id.* at *6.

The facts in *Gamboa* are both like and unlike those here, and the differences justify the significantly higher award. As here, the plaintiff in *Gamboa* was a married woman. *Id.* at *4. And as here, the defamatory falsehoods were sex-related smears. The similarities end there.

*Gamboa* was a slander case. Slanderous words reach only those who hear them, and they persist only if the hearers repeat them. Libelous words may reach untold numbers of readers and will persist for as long as the medium in which they first appeared. Consequently, libels as a class are more likely than slanders to inflict harm, as the common law recognized. *See* 1 *Rights and*

---

[2] On this point, Mississippi's libel and slander rules diverge. *See Henry v. Collins*, 158 So. 2d 28, 46 (Miss. 1963) ("The statement of the rule [for libel] . . . must not be confused with that more precisely applicable to slander or oral defamations . . . ."), *rev'd* for error in jury instructions, 380 U.S. 356 (1965). Whereas special harm is not required for libel, special harm must be proved for all slander except five categories, one being "words imputing to a female a want of chastity," *Speed*, 787 So. 2d at 632 (quoting *W.T. Farley, Inc. v. Bufkin*, 132 So. 86, 87 (1931)). The other four categories are:

> (1) Words imputing the guilt or commission of some criminal offense involving moral turpitude and infamous punishment. (2) Words imputing the existence of some contagious disease. (3) Words imputing unfitness in an officer who holds an office of profit or emolument, either in respect of morals or inability to discharge the duties thereof. (4) Words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business . . . .

*Id.*

*Liabilities in Media Content* § 6:34 (2d ed.), Westlaw (database updated June 2022). This reality led to the common law rule that libels, unlike slanders, "should never be encumbered by special harm requirements to be actionable." *Id.*

So whereas the *Gamboa* court calculated a damage award commensurate with spoken defamatory statements heard by a discrete and presumably small number of people, this Court must calculate an award commensurate with written defamatory statements read by, as Robertson reasonably worried, potentially "[t]housands of people," ECF No. 105 at 46. *See* 1 Rodney A Smolla, *Law of Defamation* § 1:27.50 (2d ed.), Westlaw (database updated November 2022) ("When a defamatory message is posted on the Internet, . . . the falsehood spreads like a virulent virus across digital space."). In another difference from *Gamboa*, Robertson's injury is likely ongoing. *See id.* ("[O]nce the proliferation of the falsehood is unleashed, it often can never be contained. The poisonous radiation continues to damage the plaintiff long after the fires from the original explosion are extinguished.").

Robertson is therefore awarded $75,000 in compensatory damages.

### E. Punitive Damages Would Serve No Purpose.

An award of punitive damages requires clear and convincing evidence that the defendant "acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65(1)(a).[3] "There must be ruthless disregard for the rights of others, so as to take the case out of the ordinary rule." *Gamble ex rel. Gamble v. Dollar Gen. Corp.*, 852 So. 2d 5, 15 (Miss. 2003). Murray's conduct would meet that standard.

---

[3] Only since 2004 has Mississippi's punitive damages statute governed punitive awards in defamation cases. *See* Miss. Code Ann. § 11-1-65 Editor's and Revisor's Notes (1) ("The 2004 amendment . . . deleted subsec. (5), which had read: (5) Subsections (1) and (2) of this section shall not apply to: . . . (b) libel and slander . . . .").

But punitive damages are an extraordinary remedy, not favored under Mississippi law and allowed "with caution and within narrow limits." *Cmty. Bank v. Courtney*, 884 So. 2d 767, 777 (Miss. 2004). "The fact-finder is never under a duty to award punitive damages." *Moeller v. Am. Guarantee & Liab. Ins. Co.*, 707 So. 2d 1062, 1073 (Miss. 1996); *see also* Miss. Code Ann. § 11-1-65(4) ("Nothing in this section shall be construed as creating a right to an award of punitive damages . . . ."). The decisive question is whether punitive damages would accomplish the statutory purposes of punishment and deterrence of future misconduct. *See* Miss. Code Ann. § 11-1-65(1)(f)(i) (providing that award must be "rationally related to the purpose to punish what occurred . . . and to deter its repetition by the defendant and others"); *see also Tunica Cty. v. Town of Tunica*, 227 So. 3d 1007, 1029-30 (Miss. 2017) (quoting *Aqua-Culture Techs., Ltd. v. Holly*, 677 So. 2d 171, 184 (Miss. 1996)) ("A trial judge may validly find that, although the conduct of a defendant in a given case is such that the awarding of punitive damages would be appropriate, the actual awarding of additional monetary damages above the compensatory damages would serve no purpose or otherwise be inappropriate.").

Here, punitive damages would serve no purpose. Murray has no money, no job, and scant prospects of ever paying even the compensatory award. *See In re Murray*, No. 20-01587-KMS, Sch. I, ECF No. 3 at 14-15 (showing that Murray is unemployed and that her only income is $350 per month in "[f]amily support payments"). And the compensatory amount is substantial enough to deter both Murray and others from similar conduct. *See Freedom Med., Inc. v. Janssens (In re Janssens)*, 449 B.R. 42, 75 (Bankr. D. Md. 2010) (declining to award punitives where compensatory amount would deter debtor and others, and debtor was insolvent and unable to pay even compensatory award), *aff'd,* 2011 WL 1642575 (D. Md. Apr. 29, 2011).

Consequently, no punitive damages are awarded.

### III. Robertson Proved Willful and Malicious Injury Under § 523(a)(6).

"[E]xceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997). The creditor must prove each required element by a preponderance of the evidence. *Hancock Bank v. Harper (In re Harper)*, 475 B.R. 540, 546 (Bankr. S.D. Miss. 2012) (citing *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991)). "'Preponderance' means . . . more likely than not." *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1164 (5th Cir. 1993).

A chapter 7 bankruptcy case does not discharge debts "for willful and malicious injury by [an individual] debtor to another entity." 11 U.S.C. § 523(a)(6). "[W]illful and malicious injury" is "a single inquiry" under § 523(a)(6). *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003). "[A]n injury is 'willful and malicious' where there is either an *objective* substantial certainty of harm or a *subjective* motive to cause harm." *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998) (emphasis added). "[D]ebtors generally deny that they had a subjective motive to cause harm," so when a debt is held nondischargeable, the usual basis is the objective test. *Berry v. Vollbracht (In re Vollbracht)*, 276 F. App'x 360, 361-62 (5th Cir. 2007).

Here, both the subjective and the objective tests are met.

As to the subjective test, Murray, in setting out to hurt Steve Robertson, purposefully and remorselessly hurt his wife. At trial, Murray offered an emotional apology. *See* ECF No. 105 at 28 ("I'm sorry Dana. I'm sorry."). But some fifteen months earlier and a full three years after the offending tweets, Murray would not say she was sorry to have hurt Dana. *See* ECF No. 105 at 29 (Murray, reading aloud from her deposition testimony: "I'm sorry to God, you know, but I don't

know if I'm sorry to Dana."). Remarkably, at trial, Murray boasted that her tweets attracted new Twitter followers. *See id.* at 25 ("I had people that were following just me and they started following me that very day, following nobody else. I mean, there was like probably at least 30 people that were trying to follow me. And I was the only person they were following.").

As to the objective test, Robertson's injury was certain from "the pernicious nature" of tweets falsely stating that she was promiscuous. *Cf. Springfield v. McClendon (In re McClendon)*, Adv. No. 11-4152, 2013 WL 1197793, at *9 (Bankr. E.D. Tex. Mar. 21, 2013) ("[T]he pernicious nature of a false statement to a third party accusing another person of a crime creates an objective substantial certainty of harm to that person . . . ."), *aff'd*, 765 F.3d 501 (5th Cir. 2014).

The $75,000 compensatory damages award is therefore nondischargeable under § 523(a)(6).

## CONCLUSION

Robertson proved that Murray's tweets were libelous, warranting an award of $75,000 in compensatory damages, which is nondischargeable as a debt for willful and malicious injury under § 523(a)(6). A separate judgment will be entered. *See* Fed R. Bankr. P. 7058.

##END##